UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ALEXANDER ROZENBERG,

                                 **Plaintiff,**

              -against-                                              MEMORANDUM
                                                                                AND ORDER
JACK SCHACHNER and TOW BOAT                  CV-09-4123 (SMG)
U.S. JAMAICA BAY,

                                 **Defendants.**
-----------------------------------------------------------X
**GOLD, S., U. S. Magistrate Judge:**

## INTRODUCTION

Plaintiff, Alexander Rozenberg, brings this action *pro se* seeking to recover damages from defendants Jack Schachner and Tow Boat U.S. Jamaica Bay. Defendants removed the action, which was originally filed in Kings County Small Claims Court, pursuant to this Court's admiralty jurisdiction. The parties have consented to reassignment of their case to a Magistrate Judge for all purposes. Docket Entry 21. I held a bench trial on February 18 and March 7, 2011. For the reasons stated below, I find in favor of defendants.

## FACTS

On August 26, 2009, plaintiff Alexander Rozenberg and his wife Marina set out in their 26-foot Sea Ray cruiser for a day of recreational boating in Jamaica Bay. At about 1:30 in the afternoon, they reached a favorite spot near Breezy Point, dropped anchor, and began to relax. Within a short period of time, however, their boat ran aground near shore.

On the date in question, the Rozenbergs were members of the Boat Owners Association of the United States. Plaintiff's Exhibit ("PX") 8. Defendant Jack Schachner is one of two partners in Tow Boat U.S. Jamaica Bay, a marine towing and salvage company that, among other

things, provides services to members of the Boat Owners Association of the United States. These services include free towing, but only when a vessel is soft, as opposed to hard, grounded. A Tow Boat U.S. document received in evidence at trial describes a vessel that is "soft grounded" as "one that has become stuck on a soft bottom (sand/mud)" and "can be dislodged with the assistants [sic] of one towing vessel and no special equipment." PX 9. The same document describes a vessel as "hard grounded" when, whether it is trapped on a hard or soft bottom, "more assets are required for refloating than described above under soft grounding." *Id.* The Towboat U.S. document goes on to note that "re-floating" of a hard grounded craft may require more than one vessel. *Id.* Freeing a hard grounded vessel is considered a salvage operation and is not covered by the Rozenbergs' Towboat U.S. membership. *Id.*; Defendants' Exhibit ("DX") B.

After their boat ran aground, plaintiff and his wife attempted to refloat it themselves. Unable to dislodge their boat, the Rozenbergs called for assistance. Defendant Jack Schachner responded to their call and, at about 2:00 p.m., approached their boat. Plaintiff asked Schachner to throw a line to his boat and tow it into deeper water. Schachner, after observing the Rozenbergs' situation, determined that he could not safely tow their vessel free with a single line pulled only by his vessel. Accordingly, Schachner told the Rozenbergs that he would charge them $3,500 to tow their boat into deeper water. The Rozenbergs, convinced that their craft was soft grounded and that they were entitled to be towed without charge, refused Schachner's demand for payment. Schachner alerted the Rozenbergs that the tide was going out and that their situation would therefore only become worse. Nevertheless, plaintiff and his wife persisted in their refusal to pay the fee Schachner sought and continued their efforts to free their craft

themselves. Schachner then notified the Fire Department that the Rozenbergs' craft had run aground and left the area.

At about 4:00 p.m., defendant Schachner approached the Rozenbergs again. By this time, the Rozenbergs' efforts to dislodge their vessel had proven unsuccessful and they were eager to leave the area quickly. Ms. Rozenberg testified that she was exhausted and afraid to stay on the boat after dark. The next high tide, however, was not due to arrive until approximately one o'clock in the morning. PX 11.

Anxious to leave but unable to free their boat themselves, the Rozenbergs negotiated with defendant Schachner, who eventually agreed to tow their boat into the water for a fee of $3,000, paid in cash. Once the parties agreed to these terms, Schachner sought assistance from his partner, John Dady, who captained a second vessel. By this time, plaintiff's boat was on the beach, approximately thirty feet from the water. PX 3. After an initial unsuccessful attempt, the two tow vessels, working together, returned plaintiff's vessel to the water. Schachner then towed plaintiff's boat, with the Rozenbergs inside, to plaintiff's home, where plaintiff paid him $3,000 in cash.

The next time the Rozenbergs used their boat, they noticed that their water pump was cycling on approximately every thirty minutes. Concerned that their boat might be leaking, they contacted their mechanic. The mechanic, Ted Fatscher, removed the engine and found a fresh crack in the aluminum gimbal housing. Fatscher opined at trial that the crack was caused by negligently towing plaintiff's boat from its side, thereby putting more pressure on its outboard stern drive than the gimbal housing could withstand. PX 20. Fatscher repaired the damage for $6,538.13. As a result of the damage and necessary repairs, the Rozenbergs were unable to use

3

their boat from late August until the beginning of October.

## DISCUSSION

Plaintiff's allegations, liberally construed, give rise to two claims. First, plaintiff contends that defendants breached their contractual obligation to him as a Boat Owners Association member when Schachner refused to free his vessel without charge and instead falsely claimed he was hard grounded and would have to pay a substantial fee to be towed. Second, plaintiff contends that, after he agreed to Schachner's demand for a fee, defendants carried out the towing operation negligently, causing damage to his boat. Plaintiff seeks to recover the $3,000 he paid defendant for towing services and the $6,538.13 he paid Fatscher to repair his boat. In addition, plaintiff seeks compensation for the time his boat was unavailable to him and for the anxiety and pain and suffering he experienced because of defendants' actions.

*1. Was plaintiff's boat hard grounded or soft grounded?*

Plaintiff did not produce any expert evidence with respect to whether his vessel was hard or soft grounded. Rather, plaintiff relies on his own testimony and that of his wife describing the water level around the boat and other surrounding circumstances. According to plaintiff and his wife, their boat was in waist-deep water when they first spoke with defendant Schachner and could easily have been freed with a tug from a single line. The Rozenbergs stated that their boat had gotten stuck under similar conditions in the past, and that they had always been able to get free without assistance.

The prior occasions described by the Rozenbergs, however, are of little value in understanding the extent of their predicament on August 26, 2009, for the very reason that, on those prior occasions, the Rozenbergs were able to free themselves without help. On the date in

4

question here, they were not. It follows then, as a matter of logic, that their boat was more firmly grounded on August 26 than it had been on the prior occasions they described in their testimony.

Second, plaintiff Rozenberg had a camera with him and was able to take pictures on August 26, 2009. DX A, ¶ 5. Two pictures taken by Rozenberg were introduced in evidence at trial. PX 1, 2. Rozenberg testified that he took the pictures at about 3:30 in the afternoon. In these photographs, the Rozenbergs' boat is high and dry, almost entirely on the beach, parallel to the shore, and with little or no water reaching it. As noted above, the Rozenbergs claim that their boat was surrounded by waist-high water at about 2:00 p.m., when defendant Schachner claimed it was hard grounded and could not be freed with a single tow line. Yet, despite the apparently heated disagreement the Rozenbergs had with Schachner at that time, plaintiff did not take any photographs illustrating his claim that his boat was surrounded by waist-high water when Schachner claimed it was hard grounded.

According to defendant Schachner, plaintiff's boat was almost completely on dry ground when he first observed it at about 2:00 p.m. Captain Schachner testified that only a portion of the craft's port side was still being hit by water, and that the water level was too low for the boat to float. Richard Pazzini, a mate on Captain Dady's boat, similarly testified that he saw plaintiff's boat grounded on the beach, high and dry, at about 1:30 in the afternoon. Defendants also offered maritime charts in evidence showing rocky areas and areas of shallow water very near to where plaintiff's boat was lodged. DX L, M and N. These charts provide at least some additional corroboration of defendants' contention that a single vessel could not safely free the Rozenbergs' boat.

Plaintiff, of course, bears the burden of proof. Pazzini and defendant Schachner testified

5

based on their substantial experience providing marine salvage and towing services. Plaintiff and his wife based their testimony on a small number of prior experiences with limited relevance to the events in question. Moreover, plaintiff had the equipment and opportunity to take photographs at the critical point in time, yet failed to do so. Accordingly, I find that plaintiff has failed to prove by a preponderance of the evidence that his craft was soft grounded at the time that Captain Schachner asked to be paid for towing it, and I find in favor of defendants on plaintiff's claim for breach of contract.

*2. Did defendants tow plaintiff's boat in a negligent manner, thereby causing damage?*

By the time the Rozenbergs and Schachner made their agreement, the Rozenbergs' boat was on the beach, parallel to the shore, and about thirty feet from the water. The towing operation was performed by providing a line to plaintiff and directing him to tie it to the bow of his craft. At a point in the line about 300 feet from shore, defendant Schachner tied two additional lines, with the other ends tied to his own boat and Captain Dady's vessel, thus forming a "Y" shaped tow line. The two salvage vessels pulled on the lines, and eventually towed plaintiff's boat into the water.

As noted above, plaintiff's expert, Ted Fatscher, opined that the damage to plaintiff's vessel was caused by towing the boat sideways. Defendants, however, offered an alternate theory of how the damage occurred, suggesting that the rocking of the vessel as it became grounded was the more likely culprit. I do not decide how the damage to plaintiff's boat was caused because I find that, in any event, the towing operation was not conducted negligently.

It is undisputed that, by the time the towing operation began, plaintiff's boat was on the beach, thirty feet from shore, with its port side facing the water. PX 3. Moreover, plaintiff

acknowledged in his own testimony that his outboard stern drive was stuck in the sand. Neither plaintiff nor his expert suggested any means of refloating plaintiff's boat from its position on the beach that would have been less likely to cause damage than the one used by defendants. As a matter of common sense, it seems hard to imagine any method of getting the Rozenbergs' boat back into the water that would not have exerted substantial pressure on the components of the outboard stern drive. In fact, when defendants made their first attempt to tow plaintiff's boat, the resistance to movement was so great that one of defendants' lines snapped.

Moreover, other evidence presented by plaintiff suggests that some damage was likely to occur even if the towing operation was carefully executed. According to their testimony at trial, the Rozenbergs called Sea Tow, another towing company, after Schachner refused to tow them without charge. Sea Tow, after asking for $3,800 to tow plaintiff's boat, advised the Rozenbergs that they should wait for high tide or their boat would likely be damaged as a result of the towing operation. As noted above, the Rozenbergs were eager to be towed before dark, and that desire led them to negotiate a price to be towed right away with defendant Schachner.

Plaintiff also contends that defendants failed to take appropriate precautions with respect to his safety. More specifically, plaintiff contends that he was almost hit by the line that snapped, and that Schachner failed to make certain that he was safely inside his boat before he began to tow it. Plaintiff, however, suffered no physical injury. Any claim of negligence with respect to his safety must therefore be dismissed.

Finally, plaintiff signed an invoice presented by defendant Schachner two or three days after the towing operation waiving his right to bring a property damage or personal injury claim. The invoice provides that plaintiff "agrees to indemnify and hold harmless the Towing

Contractor, Boat U.S. and their agents, for any and all claims for bodily injury, property or environmental damage rising out of the work requested regardless of the cause." PX 14. Because the invoice was presented to plaintiff in his own home after the towing operation was completed, it is clear that plaintiff was not coerced into signing it.

For all these reasons, I find that plaintiff has failed to prove by a preponderance of the evidence that defendants conducted the towing operation at issue in a negligent manner.

## CONCLUSION

For the reasons stated above, I find in defendants' favor on plaintiff's negligence and breach of contract claims. The Clerk shall enter judgment accordingly, and shall provide *pro se* plaintiff Rozenberg with notice of his right to appeal.

_____/s/_____
**STEVEN M. GOLD**
**United States Magistrate Judge**

**Brooklyn, New York**
**March 8, 2011**

U:\smg\rozenberg030711.wpd